EXHIBIT "A"

**OPERATING AGREEMENT**
**OF**
**ECO-PUR SOLUTIONS, LLC**

Whereas, this OPERATING AGREEMENT ("**Agreement**"), dated this 13th day of
May_____, 2012 is entered into by and between the Persons identified on the attached
Exhibit A ("**Initial Members**"), who have executed this Agreement as Members pursuant to the
provisions of the Illinois Limited Liability Company Act ("**Act**"), on the following terms and
conditions.

**Whereas,** the intentions of the parties hereto are to develop and market adhesives for the
commercial market and to develop sales to the level of $20,000,000 per year by the end of the 5th full
year of operation.

*ARTICLE 1*
**THE COMPANY**

1.1     Definitions.  Terms beginning with initialized capital letters are defined terms and
have the meanings set forth in Article 2 hereof or the Article or Section in which the defined term is
used.

1.2     Formation.  The Initial Members have caused an Illinois limited liability company to
be formed pursuant to the provisions of the Act and upon the terms and conditions set forth in this
Agreement.  Each of the Initial Members shall be admitted as Members of the Company upon the
execution of this Agreement and delivery of the Member's Initial Capital Contribution.

1.3     Name.  The name of the Company is ECO-PUR SOLUTIONS, LLC and all business
of the Company shall be conducted under that name or such other name as the Manager may from
time to time determine.

1.4     Purposes and Powers of the Company.

(a)     The purpose of the Company is to transact and carry on any lawful business for which
limited liability companies may be organized under the Act.

(b)     The Company shall have all powers and rights of a limited liability company
organized under the Act, to the extent such powers and rights are not prescribed by the Articles.

(c)     The Company may engage in any transaction, or do any act or thing, necessary,
appropriate or convenient in connection with the foregoing purpose and powers.

1.5     Principal Place of Business.  The principal place of business of the Company shall be

at 200 West Adams Street, Suite 2500, Chicago, Illinois 60606, with such additional locations as the Manager may from time to time determine. The Manager may from time to time change the principal place of business of the Company.

1.6 _Registered Agent and Office._ The registered agent and registered office for the service of process on the Company shall be set forth in the Articles. The Manager may from time to time change the registered agent or the registered office.

1.7 _Term._ The term of the Company shall commence on the date the Articles are filed in the office of the Secretary in accordance with the Act and shall continue into perpetuity unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

1.8 _Location of Records._ The Company records required to be maintained by the Act shall be located at the Company's principal place of business.

1.9 _State Filings._ The Manager shall cause the Articles and any amendments thereto to be filed in the office of the Secretary in accordance with the provisions of the Act. The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Illinois and any other state or jurisdiction in which the Company engages in business.

1.10 _Title to Company Property._ The Property shall be owned by the Company in the name of the Company as an entity and no Member shall have any ownership interest in such Property in his individual name or right, and each Member's interest in the Company shall be personal property for all purposes.

1.11 _Payments of Individual Obligations._ The Company's credit and assets shall be used solely for the benefit of the Company and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of any Member.

## ARTICLE 2
## DEFINITIONS

The following definitions shall apply to this Agreement:

2.1 **"Articles"** means the Articles of Organization filed by the Company's organizer or organizers in the office of the Secretary.

2.2 **"Bona Fide Offer"** means an offer to purchase Units from a Person other than a Member who is ready, willing, and financially able to purchase the number of Units and upon such

terms set forth in such offer. In order to qualify as a Bona Fide Offer hereunder, such offer must be in writing, be in a form legally enforceable against the Person making the offer, and be acceptable to the Unit Holder receiving such offer. This term only becomes operational if the conditions set forth in Article IX Section 9.1 have not been fulfilled.

2.3    **"Capital Account"** means a separate account maintained for each Unit Holder as provided herein.

2.4    **"Capital Contribution"** means any contribution of cash or property to the capital of the Company by a Unit Holder.

2.5    **"Code"** means the Internal Revenue Code of 1986, as now or hereafter amended.

2.6    **"Company"** means ECO-PUR SOLUTIONS, LLC

2.7    **"Affiliated Member"** means any one or more ancestor or descendant of a Member, or any entity benefiting any one or more ancestor or descendant of a Member, provided that all of the ownership or beneficial interests of such entity are owned by such ancestors and/or descendants of such Member. In addition, Affiliated Member means any person which is controlled by or otherwise affiliated with the Member.

2.8    **"Initial Capital Contribution"** means, as to each Member, that amount set forth on Exhibit A hereto across from said Member's name.

2.9    **"Involuntary Transfer"** means any Transfer by or in which any Unit Holder shall be deprived or divested of any right, title or interest in or to any Membership Interest or Units, or portion thereof, including, without limitation, (i) any Transfer to a judgment creditor pursuant to court order, (ii) any Transfer in connection with a reorganization, insolvency, bankruptcy, or similar proceedings, (iii) any Transfer to a public officer or agency pursuant to any abandoned property or escheat law, or (iv) any Transfer to the spouse or former spouse of a Unit Holder as a result of or incident to any dissolution of marriage, marital separation, or similar event, or (v) any sale in connection with execution of judgment pursuant to court order, Transfer or sale in connection with bankruptcy or Transfer or sale by a receiver.

2.10    **"Fiscal Year"** means (a) the period commencing on the effective date of this Agreement and ending on December 31, (b) any subsequent calendar year thereafter, or (c) any portion of a calendar year for which the Company is required to close its books and allocate Profits, Losses and other items of Company income, gain, loss or deduction.

2.11    **"Members"** means all Initial Members and all Persons and Transferees duly admitted to the Company in accordance with the terms and conditions set forth in Section 9.10 hereof.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                    -3-

2.12 **"Membership Interests"** means a Member's relative ownership interest in the Company, including the Member's interest in the capital, Profits, gains, and credits of the Company and all rights and obligations with respect to the Company under this Agreement and the Act, including but not limited to, the right to receive distributions, participate in the management of and vote on matters coming before the Members of the Company, to receive all information and accounting with respect to the affairs of the Company, and to inspect the books and records of the Company. The initial Membership Interest of each Member expressed as a percentage, together with the corresponding number of Units representing said Membership Interest, is set forth on Exhibit A hereto.

2.13 **"Person"** means an individual, trust, estate, or any incorporated or unincorporated organization permitted to be a member of a limited liability company under the laws of the State of Illinois.

2.14 **"Property"** means all real and personal property acquired by the Company, including cash, tangible and intangible, and any improvements thereto.

2.15 **"Secretary"** means the Illinois Secretary of State.

2.16 **"Transfer"** means any assignment, transfer, devise, encumbrance, gift, pledge, hypothecation or other disposition, in trust or otherwise. When used as a verb, to "Transfer" means to make, as transferor, a Transfer.

2.17 **"Transferee"** means any Person, other than a Member, owning any Unit.

2.18 **"Transferor"** means a Person who has Transferred Units.

2.19 **"Units or Unit"** means a divisible portion of a Unit Holder's Interest carrying with it a proportionate amount of each aspect of the rights, privileges, duties and obligations of the Unit Holder (whether as a Member or a Transferee) relating to such Unit Holder's Interest. Initially, the aggregate Unit Holder's Interests of the Unit Holders shall be represented by One Thousand (1,000) Units. Units may or may not be certificated in the discretion of the Manager.

2.20 **"Unit Holder"** means any Member or Transferee or grantor of a Trust owning any Unit.

2.21 **"Unit Holder's Interest"** means the relative ownership interest of each Unit Holder at any particular point in time. It shall be expressed as a percentage determined by dividing the Capital Account of the Unit Holder at a particular point in time by the total of all Unit Holders' Capital Accounts at that same point in time.

2.22 **"Withdrawal"** means the voluntary retirement or resignation of a Member. The

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -4-

retirement or resignation shall not be considered voluntary if any Person shall have the right or ability to cause an Involuntary Transfer of all or a portion of the retiring or resigning Member's Units.

### ARTICLE 3
### CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1     Initial Capital. Upon execution of this Agreement, each Initial Member shall make the Member's Initial Capital Contribution and a description of all Property contributed shall be set forth and attached hereto as Schedule 1 to Exhibit A.

3.2     (a)     Additional Capital Contributions. No Member shall be required to make any Capital Contribution in addition to his Initial Capital Contribution.

(b)     Note. Bishop Technologies, LTD, (Bishop Technologies), a Seychelles limited company, agrees to lend the Company $500,000; $100,000 shall be funded by April 30, 2012, $200,000 by May 31, 2012, and the balance on or before December 1, 2012. The Note ("Note") is attached as Exhibit C hereto.

3.3     Contribution of Additional Capital Contributions. Additional capital contributions shall be deemed made by a Member only if Bishop Technologies does not loan the Company $500,000 and upon acceptance by the Manager of property (including money) from any Person which is directed to be added to the Capital Account (hereinafter defined) of such Member. Payment may be made in cash or in kind including policies of insurance as determined by the Manager. Before any additional capital is accepted by the Company, the existing members will have a 30 day preemptive right to contribute additional capital to maintain their existing percentage interest. If the Members do not timely exercise this right and additional capital is raised, they will be diluted proportionately. The right of withdrawal shall be a privilege which may be exercised only voluntarily and shall not include an involuntary exercise. No Member shall have the right to require the return of any part of its capital, or to receive interest with respect thereto. No member shall have the right to receive property other than cash upon the liquidation of the Company or its interest in the Company.

3.4     Interest and Return of Capital Contributions. No Member shall receive any interest on his Capital Contributions. Except as otherwise specifically provided herein, the Members shall not be allowed to withdraw or have refunded any Capital Contributions.

3.5     Maintenance of Capital Accounts. A separate Capital Account shall be maintained for each Unit Holder. Each Member's Capital Account shall be credited with the Member's Initial Capital Contribution. Thereafter, each Capital Account shall be maintained in accordance with the capital accounting rules of section 704(b) of the Internal Revenue Code of 1986, as amended, ("**Code**") and regulations thereunder ("**Regulations**"), pursuant to the accounting procedures set

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -5-

forth in Exhibit B of this Agreement. It is intended that these accounting procedures be interpreted and applied, and if necessary modified, to cause the allocations of profits, losses, income, gain and credit pursuant to Article 4, below, to have substantial economic effect under the Code and Regulations in light of Capital Contributions made to the Company and distributions made to the Unit Holder. Notwithstanding anything contained herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligating any Unit Holder to make a contribution in excess of the Initial Capital Contribution and any additional Capital Contributions for which written notice has been given by the Manager.

    3.6    <u>Transfer of Units</u>. In the event a Member or Transferee Transfers all or a portion of such Transferee's Units, the Transferor shall succeed to that portion of the Capital Account of the Transferee that relates to the transferred Units.

    3.7    <u>Dilution</u>.

    (a)    No Member shall be required to make any additional capital contributions; however, if, in the reasonable determination of the Manager, a capital call is necessary and a Member chooses not to make his/ her/ its pro rata capital contribution, then: the Manager can withdraw the capital call; the contributing Member(s) may make the non-contributing Member(s)'s contribution and the non-contributing Member(s)'s membership interests in the Company will be recalculated and reduced pro-rata; or the contributing Member(s) may contribute the non-contributing Member(s)'s share of the capital call and such contribution shall be repaid out of the non-contributing Member(s) share of the company distributions or profits with interest thereon at the Prime rate of interest as exists from time to time of the average of the three (3) largest Banks (by deposits) in Chicago, Illinois until repaid.

    (b)    Any additional contributions after the initial capital contribution shall be based on the Member's pro rata ownership interest in the Company.

    (c)    In the event Bishop Technologies does not timely fund the Note, Bishop Technologies' equity will be diluted 1% for every $5,000 not timely lent pursuant to Section 3.2 herein.

    (d)    If the Note is not repaid in 3 years, DBCMF, LLC's interest will be reduced to 25%.


## ARTICLE 4
## ALLOCATION OF PROFITS AND LOSSES

    4.1    <u>Allocation of Profits and Losses</u>. After giving effect to any of the provisions of Exhibit B, Profits and Losses for any Fiscal Year shall be allocated among the Unit Holders in

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC        -6-

proportion to the number of Units held by each Unit Holder during such Fiscal Year.

## ARTICLE 5
## DISTRIBUTIONS

5.1    Determination.  From time to time, the Manager shall determine to what extent, if any, the Company's cash on hand exceeds the current and anticipated needs, including, without limitation, needs for operating expenses, debt service, acquisitions, reserves, and mandatory distributions, if any. To the extent such excess exists, the Manager may make distributions to one or more Members as the Members agree, otherwise distributions shall be made equally.  Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Manager.  Notwithstanding anything to the contrary contained herein after the distribution pursuant to Section 5.2 herein, all distributions shall be made to Bishop Technologies until the "Note" is repaid with interest.  Then, distributions are to be split equally.  In the event the Note is repaid without interest, within 24 months after the date of the first shipment of Product then David Frank, Manager of DBCMF, LLC will receive a priority distribution of $96,000 and immediately after the Note is paid without interest then interest will be paid to Bishop Technologies and a special distribution of the $96,000 (in lieu of interest on amounts due on the Note) and thereafter in accordance with their interests as set forth on Exhibit A as amended from time to time.

5.2    Tax Distributions.  Notwithstanding anything to the contrary, the Company shall use its best efforts, considering the case position of the Company to distribute by January 15 after the calendar year end or quarterly throughout the previous year or otherwise as may be necessary to comply with state and federal tax laws an amount equal to the product of multiplying the highest Federal and State tax rates to the taxable income of the Company as allocated to each member. However, in no event shall the Company be required to distribute any amounts under this Section 5.2 which would render the Company insolvent.

5.3    Withholdings.  Distributions to members will be made net of any withholdings for taxes, as required.

## ARTICLE 6
## RIGHTS AND DUTIES OF MEMBERS

6.1    In General.

(a)    The Members shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Members' right to vote or

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                           -7-

       otherwise participate with respect to matters relating to the Company shall be limited to those matters expressly set forth in this Agreement, the Act, or the Articles.

    (b)    The Members represent the following:

        (i)    David Frank owns 99% of the interest in DBCMF, LLC, an Illinois limited liability company and Bernadette Frank, David's wife, owns 1% of DBCMF, LLC; and

        (ii)    Val Leonov owns 100% of the interest in Bishop Technologies, LTD, a Seychelles limited company.

    (c)    The Members agree that neither DBCMF, LLC nor Bishop Technologies, LTD shall be dissolved, voluntarily or involuntarily, or their ownership interests or assets in the respective companies diluted or disposed of without the consent of the other Member with respect to the Membership interest.

    6.2    <u>Liability of Members</u>. No Member shall be liable either as a Member or as a Manager for the debts, liabilities, contracts, or any other obligations of the Company. A Member shall only be liable to make the initial Capital Contribution set forth on Exhibit A of this Agreement. Except as otherwise provided herein, no Member shall be required to make any additional capital contributions to the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under the Act or this Agreement shall not be grounds for imposing personal liability on any Member for the liabilities of the Company.

    6.3    <u>Indemnification</u>. The Company shall indemnify each Member for any act performed by the Member with respect to Company matters, as and to the full extent permitted by Act Section 15-10, but in no event for fraud, gross negligence, an intentional breach of this Agreement, or a breach of the fiduciary duty owed to the Members.

    6.4    <u>Personal Service</u>. No Member shall be required to perform services for the Company solely by virtue of being a Member. Upon substantiation of the amount and purpose thereof, a Member shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

    6.5    <u>Other Business Activities</u>. Except as otherwise expressly provided herein, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC

-8-

shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms. For purposes of this Agreement, an **"Affiliate"** means any Person with whom or in which a Member or any agent, consultant, independent contractor, employee, officer, director or stockholder of a Member is associated or has an interest including without limitation as a partner, agent, consultant, independent contractor, employee, officer, director, stockholder, or similar capacity.

     6.6     Loans to the Company. Any Member may, with the consent of all of the Members, lend or advance money to the Company. If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company. The amount of any such loan or advance by a lending Member shall be repaid out of the Property and shall bear interest at such rate as the Manager and the lending Member shall mutually agree but not in excess of the maximum rate permitted by law. No Member shall be obligated to make any loan or advance to the Company.

     6.7     Rights of Members. Except as otherwise specifically provided in this Agreement, (a) each Member shall look solely to the assets of the Company for the return of his Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company, and (b) no Member shall have priority over any other Member as to the return of his Capital Contributions, distributions, or allocations.

     6.8     Drag-Along and Tag-Along Rights

(1)     Drag-Along Right.

     (a)     Proposed Transfer. If one or more Members ("Sellers") propose to transfer (in a sale consummated in a single transfer or a series of related transfers to a single purchaser or a group of purchasers as part of a single transaction or group of related transactions) interests representing a majority of 66.7% or more of the then outstanding interests (a "Transfer"), then the Sellers shall have the right (the "Drag-Along Right"), but not the obligation, to cause each of the other Members (the "Other Members") to tender to the third party offeror (the "Third Party") for purchase, at the same price per Unit of Interest and on the same terms of payment and conditions as apply to the Sellers, a number of Units held by such Other Member equal to the total number of Interests held by such Other Member. A determination by the Sellers to exercise their Drag-Along Right shall be made based upon a written agreement to do so executed by

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC.     -9-

Sellers holding a majority of then outstanding Interests held by all Sellers.

(b)    Drag-Along Notice. If the Sellers elect to exercise their Drag-Along Right under this Section, they shall notify the Company and the Other Members in writing ("Drag-Along Notice"). Each Drag-Along Notice shall set forth (i) the name of the Third Party to which the Sellers propose to transfer Interests and the number of Interests proposed to be transferred, (ii) the address of the Third Party, (iii) the proposed amount and form of consideration and terms and conditions of payment offered by the Third Party, and any other material terms pertaining to the Transfer ("Third Party Terms"), and (iv) that the Third Party has been informed of the rights provided for in this Section and has agreed to purchase Interests in accordance with the terms hereof. The Drag-Along Notice shall be given at least 30 days before settlement of the proposed Transfer.

(c)    Consummation. Upon the giving of a Drag-Along Notice, each Other Member shall sell the number of Interests set forth therein to the Third Party on the Third Party Terms; provided, however, that neither the Sellers nor any Other Member shall be obligated to consummate the sale of any Interests if the Third Party does not purchase the number of Interests as specified in such Notice from the Sellers and the Other Members.

(d)    Settlement. At the settlement of any Transfer pursuant to this Section, the Third Party shall remit to each Member the consideration for the total sales price of the Interests of such Member sold pursuant hereto, upon delivery by such Member of certificates for such Interests, free and clear of all liens, claims, security interests and other encumbrances, duly endorsed in blank for transfer or accompanied by stock powers duly executed in blank, and the compliance by such Member with all other conditions to settlement generally applicable to the Sellers and all Other Members selling Interests in such transaction (including the provision by the Other Members to the Third Party of representations and warranties covering the same subject matter as those provided by the Sellers).

(2)    Tag-Along Right.

(a)    Proposed Transfer. If one or more Members (the "Sellers") propose to transfer (in a sale consummated in a single transfer or a series of related transfers to a single purchaser or a group of purchasers as part of a single transaction or group of related transactions) Interests representing 66.7% or more of the then outstanding Interests ("a Transfer"), and provided that the Transfer is not an Exempt Transfer (as defined below), then each of the Members other than the Sellers (the "Tag-Along Members") shall have the right (the "Tag-Along Right") to require the proposed purchaser to purchase from such Tag-Along Member up to the number of whole Interests not to exceed the number derived by multiplying the total number of Interests to be purchased by the proposed purchaser in such transaction their Interests. Any Interests purchased from Tag-Along Members pursuant to this Section shall be paid for at the same price per Interest and upon the same terms of payment and conditions as such proposed Transfer by the Sellers ("Transfer Terms").

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                    -10-

(b) <u>Tag-Along Notice.</u> The Sellers shall promptly notify the Tag-Along Members in the event they propose to make a Transfer giving rise to Tag-Along Rights, and shall furnish the Tag-Along Members with the Transfer Terms and a copy of any written offer or agreement pertaining thereto. The Tag-Along Right may be exercised by any Tag-Along Member by delivery of a written notice to each Seller proposing to sell Interests (the "Tag-Along Notice") within 15 days following such Tag-Along Member's receipt of such notice from the Sellers. The Tag-Along Notice shall state the number of Interests that such Tag-Along Member proposes to include in such Transfer to the proposed purchaser. In the event that the proposed purchaser does not purchase the specified number of Interests from the Tag-Along Members on the Transfer Terms, and subject to the same terms and conditions as are applicable to the Sellers in such transaction, then the Sellers shall not be permitted to sell any Interests to the proposed purchaser in the proposed Transfer.

(c) <u>Settlement.</u> At the settlement of any Transfer pursuant to this Section, the proposed purchaser shall remit to each selling Member the consideration for the total sales price of the Interests of such Member sold pursuant hereto, upon delivery by such Member of certificates for such Interests, free and clear of all liens, claims, security interests and other encumbrances, duly endorsed in blank for transfer or accompanied by stock powers duly executed in blank, and the compliance by such Member with all other conditions to settlement generally applicable to the Sellers and all other Tag-Along Members selling Interests in such transaction (including the provision by the Tag-Along Members to the proposed purchaser of representations and warranties covering the same subject matter as those provided by the Sellers).

(d) <u>Exempt Transfer.</u> The following transactions shall constitute "Exempt Transfers" as that term is used in this Agreement: (i) a Transfer to the Company, (ii) a Transfer by will or intestate succession to such Member's executors, administrators, testamentary trustees, legatees or beneficiaries, (iii) a Transfer in a public offering pursuant to an effective registration statement or exemption therefrom pursuant to Regulation A under the Securities Act of 1933, as amended, or pursuant to Rule 144 promulgated thereunder, (iv) a Transfer that has been approved in writing by the holders of a majority of the Interests held by all Members] Interests representing a majority of the votes which may be cast by all Members in an election of directors, and (v) a Transfer to one or more Related Parties to such Member. As used herein, the term "Related Parties" with respect to any Member means: (i) any other person that directly or indirectly, through one or more intermediaries, has control of or is controlled by, or is under common control with, such Member; and (ii) with respect to any Member which is an individual, a lineal descendent, sibling, lineal descendent of a sibling, in each case whether by blood or adoption, parent, spouse, spouse of a lineal descendent or lineal descendant of a sibling or a trust for the benefit of any one or more of the foregoing.

6.9 <u>Key Man Insurance.</u> The Company shall purchase Key Man Insurance for David Frank and Valery Leonov in the amount of $1,000,000.00 each.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC      -11-

### ARTICLE 7
### MANAGEMENT

7.1  Manager.  The management of the Company shall be vested in one or more Manager ("**Manager**").  The initial Manager shall be DBCMF, LLC, David Frank, Manager.  The Members at any time and from time to time may increase or decrease the number of Manager on the Manager by unanimous consent.

7.2  Successor.  In the event the above named Manager is either unable or unwilling to act as Manager of the Company, then a replacement Manager may be elected in accordance with the terms set forth in Section 7.6.

7.3  Action of the Manager.  Unless otherwise expressly provided by the Act, the Articles, or the terms of this Agreement, the vote, approval or consent of the Manager shall constitute the action necessary to bind the Company.

7.4  Term of a Manager.  Each Manager shall serve as a Manager until the earliest to occur of its dissociation as a Member, its resignation as a Manager, or its removal as Manager pursuant to Section 7.5.

7.5  Removal of a Manager.  Any Manager will be considered to have automatically resigned as a Manager upon an Involuntary Transfer of any or all of such Manager's Units, the Transfer of all of its Units, breach of a manager's fiduciary duty of loyalty or care to the Company as determined by a Court of competent jurisdiction, or any other event which makes him ineligible to be a Manager pursuant to the terms of this Agreement.  Any Manager may be removed by vote of the Members upon the occurrence of any of the following events: (i) the Manager's willful or intentional violation or reckless disregard of its duties to the Company; or (ii) the Manager's gross negligence, self-dealing or embezzlement.  Any Manager who is adjudicated by a court of competent jurisdiction to have breached its fiduciary duty as defined herein and is thus removed, may continue as a Member of the Company; however, if a Manager is removed but retains its Membership Interest, it should not be permitted to vote that interest on all matters, but for the sale of substantially all the assets of the Company, for a period of 90 days.

7.6  Vacancy.  In the event there is no Manager, a new Manager shall be elected by a majority vote of the Members.

7.7  Authority of the Manager.

(a)  Subject to the limitations and restrictions set forth in this Agreement, the Manager shall be responsible for the day to day administration of the Company and its Property and shall have such authority as shall be necessary or convenient to discharge such responsibility.

(b)    The Manager shall have all the rights, powers and obligations provided in the Act and as otherwise provided by law, and any action taken by the Manager shall constitute the act of and serve to bind the Company for the day-today administration of the Company which is defined as:

    (i)    opening of bank accounts of the Company;

    (ii)    purchase of liability or any other insurance to protect the business and/or assets of the Company;

    (iii)    managing the offices of the Company;

    (iv)    commencement of lawsuits and other proceedings;

    (v)    entering into any agreement, instrument or other writing in such forms which are usual and customary in running the day-to-day operations of a business provided that: (a) such agreements are not entered into with family members of the Manager or with entities affiliated with the Manager or his family members, and (b) if such agreements are not with family members or affiliates of the Manager, the agreements do not obligate the Company to pay more than $10,000;

    (vi)    retention of accountants, attorneys, experts, marketing professionals, or other agents;

    (vii)    taking any other lawful action that the Manager reasonably considers necessary, convenient, or advisable in connection with the day-to-day business and affairs of the Company; and

    (viii)    make distributions equally to pay any individual Taxes due to being a Member.

(c)    Except by 2/3 vote of the Members, the Manager may not:

    (i)    raise capital for the Company in the form of loans, investments and/or equity contributions;

    (ii)    pledge and/or encumber Company assets;

    (iii)    enter into an agreement to take the Company public;

    (iv)    purchase, lease or otherwise acquire, or sell, lease or otherwise dispose of substantially all of the assets;

    (v)    hiring of executives or employees who are paid a salary greater than $100,000 per annum;

    (vi)    firing executives; or

    (vii)    perform any other non-day-to-day operations decisions regarding the Company and its non-day-to-day business.

(d)    In dealing with a Manager, acting for or on behalf of the Company, no person shall be required to inquire into, and all persons are entitled to rely conclusively on, the power and authority of the Manager to bind the Company. Every deed, bill of sale, assignment, lease, pledge, mortgage or other instrument executed by a Manager with respect to Property shall be conclusive evidence in favor of every person relying upon or claiming under any such instrument that (i) at the time of the

delivery thereof this Agreement was in full force and effect, (ii) that such instrument was executed in accordance with the terms, conditions and limitations contained in this Agreement and is binding upon the Company and all its Members, and (iii) that such Manager was duly authorized and empowered to execute and deliver every such deed, bill of sale, assignment, lease, pledge, mortgage or other instrument.

      7.8    <u>Duties of a Manager.</u>    DBCMF, LLC, as Manager, agrees to make David Frank available to perform his duties operating an industrial adhesive business on a full time basis for the Company until Bishop Technologies is repaid its Note plus interest (or as otherwise provided in Section 5). After that time, DBCMF, LLC, will make David Frank available to perform its duties as needed in its discretion to accomplish the objectives set forth herein. Only for the period of time that a balance on the Note is outstanding, the Company will give Bishop Technologies notice of any contract or expenditure in excess of $1,000. No expenditure in excess of $10,000 is to be made without the express written consent of Bishop Technologies. If the Company does not receive a response from Bishop Technologies within 5 days, approval will be deemed to have occurred. Once the Note is repaid, the Company shall no longer be required to obtain the express written consent of Bishop Technologies for any expenditure. Manager shall provide a monthly report to Members regarding the Company's revenues and expenses.

      7.9    <u>Indemnity.</u>  The Company shall indemnify and hold harmless the Manager (and its shareholders, officers, directory, employees and agents, if any) from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of the Manager's activities on behalf of the Company, including but not limited to any judgments, awards, settlements, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were for a purpose reasonably believed to be in the best interests of the Company and were not performed or omitted fraudulently or in bad faith or as a result of gross negligence by such party and were not in violation of such Manager's fiduciary obligation to the Company. Any such indemnification shall only be from the assets of the Company.

      7.10    <u>Compensation and Expenses.</u> David Frank, Manager of DBCMF, LLC shall receive a salary for services rendered to or on behalf of the Company in the amount of $8,000 per month gross plus fringe benefits, and health insurance benefits. After the Note is repaid, David Frank, Manager of DBCMF, LLC shall have access to a Company owned vehicle. A Manager may charge the Company, and shall be reimbursed, for any reasonable expenses incurred in connection with the Company's business.

      7.11    <u>Deadlock.</u> If a deadlock should occur between Members on any issue, the status quo, before such dispute arose, shall prevail. However, any Manager may request the appointment of a third nonpartisan party to resolve the deadlock. Such third party shall be mutually agreed on by all Members.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC           -14-

7.13   Officers.

(a)   Appointment of Officers.  The Manager may select such Officers as it deems necessary or desirable for the effective management of the Company and the pursuit of the Company's business.

(b)   Number.  The Officers of the Company may be a President, one or more Vice-Presidents (the number thereof to be determined by the Manager), a Secretary, and a Treasurer, and such Assistant Secretaries, Assistant Treasurers or other Officers as may be elected or appointed by the Manager.  Any two or more offices may be held by the same Person.  All Officers and agents of the Company shall have such express authority and perform such duties in the management of the Property and affairs of the Company as may be provided herein, or as may be determined by resolution of the Manager not inconsistent with this Agreement, and such implied authority as is recognized by the common law from time to time.

(c)   Election and Term of Office.  Officers of the Company shall be elected by the Manager by written action taken and/or meetings held for such purpose. The Manager may create and fill new offices from time to time. An Officer shall hold office until his or her successor shall have been duly elected and shall have qualified, until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided. Election or appointment of an Officer or agent shall not of itself create contract rights.

(d)   Removal.  Any Officer or agent elected or appointed by the Manager may be removed by the Manager whenever in its judgment the best interests of the Company would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the party so removed.

(e)   Vacancies.  A vacancy in any office because of death, resignation, removal, disqualification, or otherwise, or because of the creation of an office, may be filled by the Manager for the unexpired portion of the term.

(f)   The President. The President shall be the principal executive Officer of the Company and shall in general supervise and control all of the business and affairs of the Company. He or she may sign, with the Secretary or any other Officer of the Company, contracts or other instruments which the Manager has authorized to be executed on behalf of the Company, except in cases where the signing and execution thereof shall be expressly delegated by the Manager or by this Agreement to some other Officer or agent of the Company or to the President alone, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of President and such other duties as may be prescribed by the Manager from time to time.

(g)   The Vice-Presidents.  In the absence of the President or in the event of his or her

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC

-15-

inability or refusal to act, the Vice-President (or in the event there be more than one Vice-President, the Vice-Presidents in the order designated, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. Any Vice-President may perform such other duties as from time to time may be assigned to him or her by the President or by the Manager.

(h)     The Secretary.  The Secretary shall: (a) keep, or supervise and be responsible for the keeping of, the minutes and records of all meetings and official actions of the Manager in one or more books provided for that purpose; (b) see that all notices of such meetings are duly given or waivers of notice obtained in accordance with the provisions of this Agreement or as required by law; (c) be custodian of the Company records; (d) keep a register of the post office address of each Member which shall be furnished to the Secretary by such Member; (e) have the authority to certify this Agreement, resolutions of the Manager and committees thereof, and other documents of the Company as true and correct copies thereof; and (f) in general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to him or her by the President or by the Manager.

(i)     The Treasurer.  If required by the Manager, the Treasurer shall give a bond for the faithful discharge of his or her duties in sum and with such surety or sureties as the Manager shall determine. He or she shall: (a) have charge and custody of and be responsible for all funds and securities of the Company; (b) receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies or other depositories as shall be selected by the Manager; and (c) in general perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him or her by the President or by the Manager.

(j)     Assistant Secretaries and Assistant Treasurers.  The Assistant Secretaries as thereunto authorized by the Manager may sign with the President or a Vice-President certificates for Interests of the Company, the issuance of which shall have been authorized by a resolution of the Manager. The Assistant Treasurers shall respectively, if required by the Manager, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Manager shall determine.  The Assistant Secretaries and Assistant Treasurers, in general, shall perform such duties and exercise such authority as shall be assigned or granted to them by the Secretary or the Treasurer, respectively, or by the President or the Manager.

### ARTICLE 8
### TAX ELECTIONS AND TAX MATTERS PARTNER

The Manager may make any tax elections for the Company allowed under the Code or the tax laws of any state or jurisdiction having taxing jurisdiction over the Company.   The Manager shall designate from time to time the Manager who will act as **"Tax Matters Partner"** for purposes of

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                          -16-

Sections 6221 - 6231 of the Code and the Regulations. The Tax Matters Partner agrees to use its best efforts to comply in good faith with all provisions of the Code concerning a tax matters partner and to take all actions necessary to make each Member a notice partner under the Code. The Tax Matters Partner will use its best efforts to give each Member copies of all notices or other material communications delivered to or by him with respect to federal, state or local tax matters, negotiations, decisions, settlements or other events. The Tax Matters Partner may choose the forum in which to pursue any litigation without the consent of the Members. The initial Tax Matters Partner of the Company shall be David Frank, Manager of DBCMF, LLC.

## ARTICLE 9
## TRANSFERS OF UNITS

9.1     Restriction on Transfers. Except as permitted in this Article 9, no Unit Holder shall Transfer any portion or all of such Unit Holder's Units.

9.2     Permitted Transfers. Notwithstanding anything contained herein to the contrary, a Unit Holder may make any of the following Transfers ("Permitted Transfers"):

(a)     Any Transfer of Units of an incompetent Unit Holder to his guardian or legal representative, and any Transfer made by said guardian or legal representative that said incompetent Member otherwise would have been permitted to make pursuant to this Article 9; and

(b)     Any Transfer of Units after first obtaining the prior written consent from each of the Members, which consent may be granted or withheld in each Member's sole and absolute discretion. Any attempt to Transfer Units without first obtaining the required consents (an "Unsanctioned Transfer") shall be null and void and of no force and effect and shall cause any Member who attempts an Unsanctioned Transfer to thereafter hold his Units as a Transferee subject to all the terms and conditions set forth herein. The obtaining of consent in connection with any Transfer shall not limit or waive the need for the obtaining of consent in connection with any subsequent Transfer.

The transferee of any Units pursuant to this Section 9.2 shall be a Transferee subject to all of the terms and conditions contained herein. Permitted Transfers do not confer Membership Interests on the Transferee unless the Transferee satisfies all of the requirements contained in Section 9.10 hereof.

9.3     Intentionally Omitted.

9.4     Intentionally Omitted.

9.5     Transfer of Units upon Death. Upon the death of David Frank or Val Leonov, liquidation or dissolution of a Member, its Interest in the Company shall vest in its successors;

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -17-

provided, however, that any such successors shall not have the right to be admitted as a Member of the Company unless such admission is consented to by the surviving Member(s), which consent may be given or withheld by them in their sole and absolute discretion. Notwithstanding the foregoing sentence, the survivor has the obligation to purchase the deceased Member's interest for the following amounts:

(a)     *Upon the death of David Frank*: Bishop Technologies shall purchase the interest of DBCMF, LLC in the Company for the amount of 50% of the fair market value of the Company as determined by the average valuations of appraisers hired by the company, David Frank's estate or trust, and Val Leonov payable in annual installments over 5 years with interest at the Prime Rate of interest as published in the Wall Street Journal from time to time commencing one year from the date of death with $500,000 (50% of the value of the amount of the Key Man Life Insurance owned by the Company on the life of the David Frank pursuant to Section 6.9 of this Agreement) payable as a downpayment or as a minimum payment if the fair market value is less than $1 million, which shall be cross-collateralized with a pay proceeds letter;

(b)     *Upon the death of Valery Leonov*: DBCMF, LLC shall purchase the interest of Bishop Technologies in the Company for the amount of 50% of the fair market value of the Company as determined by the average valuations of appraisers hired by the company, Valery Leonov's estate or trust, and David Frank payable in annual installments over 5 years with interest at the Prime Rate of interest as published in the Wall Street Journal from time to time commencing one year from the date of death with $500,000 (50% of the value of the amount of the Key Man Life Insurance owned by the Company on the life of the Valery Leonov pursuant to Section 6.9 of this Agreement) payable as a downpayment or as a minimum payment if the fair market value is less than $1 million, which shall be cross-collateralized with a pay proceeds letter.

9.6     <u>Intentionally Omitted.</u>

9.7     <u>Determination of Book Value</u>.  For purposes of this Article, the Book Value of each Unit shall be established at any time and from time to time by the accounting firm regularly employed by the Company in accordance with generally accepted accounting principles applied on a consistent basis from year to year.  Such accounting firm shall make any and all reasonable assumptions which may be necessary for such computation.  Such determination of Book Value shall be final and binding on all parties.

9.8     <u>Indirect Transfers</u>.  For purposes of this Article 9, the term "Unit Holder" shall include the beneficiaries of a trust that is a Unit Holder, the shareholders of a corporation that is a Unit Holder, the partners of a partnership that is a Unit Holder and the members of a limited liability company that is a Unit Holder.  The term "Units" shall include the beneficial interests of a trust that is a Unit Holder, the stock of a corporation that is a Unit Holder, any interest in the capital of a partnership that is a Unit Holder and any interest in the capital of a limited liability company that is a Unit Holder (an "Indirect Interest").  In the event of a Transfer of an Indirect Interest in a Member

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                    -18-

which Transfer has not been approved in writing by all of the Members, said Member shall thereafter become a Transferee under this Agreement subject to all of the terms and conditions contained herein. In addition, upon the dissolution, liquidation, termination, or the cessation of legal existence of a Unit Holder, any Units transferred to the holder of an Indirect Interest shall be held as a Transferee subject to all of the terms and conditions contained herein. In the event such a Transfer to a Transferee is not a Permitted Transfer, the Company has an Option to Purchase and if not exercised the remaining Member has an Option to Purchase at Book Value payable in annual installments over 5 years without interest.

      9.9    Rights and Privileges of a Transferee.

      (a)    A Transferee of any Units pursuant to this Agreement shall have only the entitlements of an assignee under the Act or under the terms and conditions contained herein.

      (b)    Without limiting the generality of Subsection 9.9(a) above, a Transferee shall have no right to require any information or account of the Company, inspect the Company books, or vote on any matter requiring a vote of the Manager or Members.

      (c)    A Transferee shall become a Member only upon fulfillment of the applicable conditions for admission as a Member contained in Section 9.10 below.

      9.10    Admission to Company.  A Transferee shall become a Member if and only if:

      (a)    Every Member has given his written consent to admit the Transferee as a Member, which consent may be granted or withheld in each Member's sole and absolute discretion; and

      (b)    The Transferee has:

      (i)    In form satisfactory to the Manager, accepted and agreed to be bound by all of the terms and provisions of this Agreement and assumed all of the obligations and responsibilities of a Member under this Agreement;

      (ii)    In the case of a corporate assignee, provided a certified copy of a resolution of its Board of Directors authorizing it to become a Member under the terms and provisions of  this Agreement;

      (iii)    Executed a statement that it is holding the transferred Units for investment and not for resale;

      (iv)    Executed such other documents or instruments as the Manager may require in order to effect the admission of the Transferee as a Member; and

(v)    Paid such reasonable expenses as may be incurred by the Company in connection with the admission of the Member.

9.11    Allocations upon Transfers of Units. If any Units are transferred during any Fiscal Year in compliance with the provisions of this Article, Profits, Losses, and all other items attributable to the transferred Membership Interests shall be divided and allocated between the Transferor and the Transferee by taking into account their varying Membership Interests during the Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager. All distributions on or before the date of such transfer shall be made to the Transferor, and all distributions thereafter shall be made to the Transferee.

## ARTICLE 10
## WITHDRAWAL

No Member may withdraw as a Member.   A Member may, however, withdraw his membership and become a Transferee.

## ARTICLE 11
## DISSOLUTION AND WINDING UP

11.1    Liquidating Events. The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following events ("**Liquidating Events**"):

(a)    The unanimous written consent of all of the Members;

(b)    The bankruptcy of a Unit Holder unless the business of the Company is continued by the consent of a majority in interest of the remaining Members. If there are no remaining Member-Manager, then the bankruptcy of a Member shall cause the Company to be dissolved unless the business of the Company is continued by the consent of a majority in interest of the remaining Members (for purposes of this subsection the term "majority in interest" shall have the meaning prescribed by Section 5.01(3) of Revenue Procedure 95-10);

(c)    A decree of judicial dissolution of the Company as provided in the Act; and

(d)    Any event not set forth above that under the Act requires the dissolution of the Company.

11.2    Effect of Dissolution. Upon dissolution, the Company shall cease carrying on its business (as distinguished from the winding up of the Company business) but the Company is not terminated and shall continue until the winding up of the affairs of the Company is completed and the Articles of Dissolution are filed with the Secretary.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                        -20-

11.3 <u>Procedure for Winding Up and Distribution.</u> If the Company is dissolved, the Manager, or if there are no Manager, any person elected by a majority of the Members shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and Company assets, shall cause the Company assets to be liquidated as promptly as is consistent with obtaining the fair value therefor and, unless otherwise required by law, shall apply and distribute the proceeds of liquidation, as well as any other Company assets, in the following order:

(i)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than the Unit Holders;

(ii)    Next, to the payment and discharge of all of the Company's debts and liabilities to the Unit Holders;

(iii)    Next, to the Unit Holders to the extent of their aggregate Capital Contributions;

(iv)    Finally, the balance, if any, to the Unit Holders in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

The Manager shall receive no additional compensation for any services performed pursuant to this Article.

## *ARTICLE 12*
## **ACCOUNTING, BOOKS AND RECORDS**

12.1 <u>Accounting, Books and Records.</u> The Company shall maintain at its principal place of business separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with generally accepted accounting principles consistently applied and, to the extent inconsistent therewith, in accordance with this Agreement. The books and records of the Company shall be maintained on a cash receipt and disbursements method of accounting. Once each calendar year, any Member or his designated representative shall have access and the right to inspect and copy the contents of such books or records.

12.2 <u>Reports.</u>

(a)    <u>In General.</u> The Manager shall be responsible for the preparation of financial reports

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC        -21-

of the Company and the coordination of financial matters of the Company with the Company's accountants.

      (b)    <u>Tax Information</u>.  All necessary tax information shall be delivered to each Unit Holder after the end of each Fiscal Year of the Company.

      (c)    <u>Additional Records</u>.  The Manager shall keep and maintain all additional records required by the Act at the Company's principal place of business.

## ARTICLE 13
## AMENDMENTS, MEETINGS AND VOTING

      13.1    <u>Amendments</u>.  Amendments to this Agreement may be proposed in writing by any Member.  Following receipt of a written proposal, the Manager shall submit to the Members a verbatim statement of any proposed amendment, provided that counsel for the Company has approved the written proposal as to form, and the Manager shall include in any such submission the Manager' recommendation as to the proposed amendment.  The Manager shall call a meeting to vote on the proposed amendment.  A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the vote of the Members owning at least 66 2/3% of the Membership Interests.

      13.2    <u>Meetings of the Members</u>.

      (a)    Meetings of the Members may be called by any Member. The call shall be in writing and shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than ten (10) days or more than ninety (90) days prior to the date of such meeting.  The notice shall state the time, place and purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy.  Members may vote in person or by proxy at such meeting.

      (b)    For the purpose of determining the Members entitled to vote at any meeting of the Members, the Manager shall fix, in advance, a date as the record date for any such determination.  Such date shall not be less than ten (10) business days or more than twenty (20) business days prior to the date of such meeting.

      (c)    Each Member may authorize any person or persons to act for him by proxy on all matters in which a Member is entitled to participate.  Every proxy must be signed by the Member or his attorney-in-fact.  No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise specifically provided in the proxy.  Every proxy shall be revocable at any

time by the Member executing it.

    (d)    Each meeting of Members shall be conducted by the Manager pursuant to such rules for the conduct of the meeting as the Manager deem appropriate.

    13.3    <u>Voting</u>. Except as otherwise provided in this Agreement, the affirmative vote of Members holding a majority of the Membership Interests shall be required to approve any matter requiring a Member vote.

    13.4    <u>Action by Written Instrument</u>. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding a majority of the Membership Interests.

### *ARTICLE 14*
### CONFIDENTIAL INFORMATION

    14.1    The Company has furnished to each Member certain information which has been identified as either non-public, confidential, or proprietary in nature. The Company may also impart to the Members from time to time additional non-public, confidential, or proprietary information, including, without limitation, one or more business plans and other procedures, concepts, methods, trade secrets, documentation, diagrams, manuals, handbooks, training or processing materials, marketing techniques or development plans, financial and pricing information, and the like, whether oral or written. All such material heretofore or hereafter furnished to the Members, together with any analysis, compilations, studies, summaries, or documents prepared for review by the Members, their agents, or their employees, is hereinafter referred to as the "Confidential Information." The Confidential Information also includes any information described above which the Company obtains from third parties and which the Company treats as confidential or proprietary, regardless of whether such information is owned or developed by the Company. Confidential Information shall not include information that: (i) is in or comes into the public domain without any breach or any obligation of confidentiality owed to the Company; (ii) was in a Member's possession prior to this Agreement's date of execution without the breach or existence of any obligation of confidentiality to the Company; (iii) is independently developed by or comes into the possession of a Member at any time hereafter without reference to any information from the Company and without any breach of any obligation of confidentiality owed to the Company; or (iv) is required to be disclosed under or by applicable law, regulation or lawful court order.

    14.2    Each Member agrees to maintain the Confidential Information in secrecy and confidence and not to, directly or indirectly, without the prior written consent of the Company, disclose or cause to be disclosed, or use or make known, or suffer or permit any former, current, or prospective employee or agent of such Member or any Affiliate of such Member to disclose or cause to be disclosed, or use or make known, any of the Confidential Information, except in connection

with the conduct of the Company's business.

14.3    Each Member agrees that any material violations of this Article 14 would be highly injurious and cause irreparable harm to the Company and its Members. Therefore, each Member consents and agrees that if such Member materially violates the terms of this Article 14, the Company shall be entitled, in addition to any other rights and remedies that it may have (including monetary damages), to apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any continuing or threatened violation of, the provisions of this Article 14 by such Member. If the Company shall institute any action or proceeding to enforce the provisions of this Article 14, each Member hereby waives the claim or defense that this is an adequate remedy at law, and each Member agrees in any such action or proceeding not to interpose the claim or defense that such remedy exists at law.

14.4    The Manager shall have the right to keep confidential from the Members, for such period of time as the Manager deems reasonable, any information which the Manager reasonably believes to be in the nature of trade secrets or other information, the disclosure of which the Manager in good faith believes is not in the best interest of the Company or could damage the Company or its business or which the Company is required by law or by agreement with a third party to keep confidential.

14.5    Any demand by a Member under this section shall be in writing and shall state the purpose of such demand.

### ARTICLE 15
### MISCELLANEOUS

15.1    Entire Agreement. Except as set forth in the Promissory Note dated April 30, 2012, and Security Agreement, this instrument constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings and agreements, whether oral or written, between the parties with respect to the subject matter hereof. Any Exhibits attached hereto shall be considered incorporated into and become a part of this Agreement.

15.2    Notices. Any and all notices, payments, designations, consents, or any other communications provided for herein shall be in writing and shall be delivered in person, by overnight courier or by certified mail, return receipt requested, which shall be addressed, in case of Company, to its principal business office, and in the case of a Member, to his last known place of residence, as reflected on Company's books and records. Any such notice shall be deemed to have been given as of the earlier of (a) the date of actual receipt of such notice, or (b) the first day following delivery to an overnight courier service; or (c) the second day following delivery of notice by certified United States mail. Any Member may from time to time specify a different address by written notice to the Company.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                  -24-

15.3  Binding Effect.  Except as otherwise specifically provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the party and his respective legal representatives, transferees, successors and assigns.

15.4  Construction.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.  The terms of this Agreement are intended to embody the economic relationship among the Members and shall not be subject to modification by, or be conformed with, any actions by the Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

15.5  Headings.  The headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

15.6  Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

15.7  Further Action.  Each Member, upon the request of any General Member, agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

15.8  Variation of Pronouns.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

15.9  Governing Law.  The laws of the State of Illinois shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

15.10  Sole and Absolute Discretion.  Except as otherwise specifically provided in this Agreement, all actions which the Manager may take and all determinations which the Manager may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of the Manager, which discretion shall be exercised in a fiduciary capacity.

15.11  Creditors.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or any creditor of any of the Members, other than creditors under Section 6.6 of this Agreement.

15.12  Specific Performance.  Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                               -25-

performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the non-breaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

15.13  <u>Assurances</u>.  Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the Property.

15.14  <u>Jurisdiction and Venue</u>.  Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Illinois or any state court in Illinois having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

15.15  <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by affixing the signature of each of the parties hereto to one of such counterpart signature pages; all of such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the co-signers had signed a single signature page.

15.16  <u>Company's Partnership Status or Disregarded Entity if Sole Member</u>.  It is the intent of the Members that the Company qualify and be treated as a partnership, or a disregarded entity if only a sole Member, for federal income tax purposes (the "Company's Status"). The Manager are, therefore, authorized, empowered and directed to take any actions which, in the Manager sole discretion, is necessary to ensure the uninterrupted continuance of the Company's Status including, without limitation, altering and amending this Agreement to the extent necessary to comport with the Code, the regulations thereunder, and all applicable ruling positions published by the Internal Revenue Service which in the opinion of Company's consul have or may have an effect on the Company's Status.

15.17  <u>Right to Attorney Review.</u>   Both parties have the right to have counsel review this document and advise them accordingly.

15.18  <u>Legal Representation.</u>  The Company has engaged Daluga & Boland, LLC (Daluga & Boland), as legal counsel to the Company, with respect to the preparation of this Agreement. Daluga

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                   -26-

& Boland has not been engaged by any of the Members to protect or otherwise represent the interests of the members with respect to the preparation of this Agreement or with respect to the interests of such Member vis-à-vis the Company. Each Member: (a) approves Daluga & Boland's representation of the Company in the preparation of this Agreement; (b) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of such Members, as the case may be, vis-à-vis the Company or the preparation of this Agreement, and that actual or potential conflicts of interest may exist among the Members in connection with the preparation of this Agreement (with the consequence that a Member's interest may not be vigorously represented unless such Member engages its own legal counsel); and (c) acknowledges further that such member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement. Nothing in this Section 15.18 shall preclude the Company from selecting different legal counsel to represent it at any time in the future.

*The remaining portion of this page has been intentionally left blank.*

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                     -27-

**SIGNATURE PAGE FOR THE**
**OPERATING AGREEMENT**
**OF**
**ECO-PUR SOLUTIONS, LLC**

**MANAGER:**

By executing this signature page, the undersigned does hereby affirm that DBCMF, LLC is the sole Manager of ECO-PUR SOLUTIONS, LLC, an Illinois limited liability company, constituting the Manager Committee and do hereby affirm the terms and provisions of this Operating Agreement.

DATED this *13ᵀᴴ* day of _*May*_, 2012

DBCMF, LLC:

By: _____
        David Frank, its Manager

**SIGNATURE PAGE FOR THE**
**OPERATING AGREEMENT**
**OF**
**ECO-PUR SOLUTIONS, LLC**

**MEMBERS:**

By executing this signature page, the undersigned do hereby agree to become a Members of ECO-PUR SOLUTIONS, LLC, an Illinois limited liability company, accept and adopt each and every provision of this Operating Agreement and irrevocably constitute and appoint the sole Manager of the Company, with full power of substitution, their true and lawful attorney-in-fact, in their name, place and stead to make, execute, sign, acknowledge, record and file on their behalf and on behalf of the Company, any and all instruments as may be deemed necessary or desirable by the Manager to carry out fully the provisions of the Operating Agreement in accordance with its terms.

DATED this _13th_ day of ___May___, 2012

DBCMF, LLC:

By: _____
       David Fram, its Manager

Bishop Technologies, LTD:

By: _____
       Valery Leonov, General Partner

**EXHIBIT A TO THE**
**OPERATING AGREEMENT**
**OF**
**ECO-PUR SOLUTIONS, LLC**

LISTING OF THE MEMBER'S NAMES, ADDRESSES
TAXPAYER IDENTIFICATION NUMBERS, INITIAL
CAPITAL CONTRIBUTIONS AND UNITS

| Names, Addresses and Taxpayer Identification Numbers of Members | Initial Capital Contributions | No. of Units | Initial Membership Interest |
|---|---|---|---|
| DBCMF, LLC | License Agreement for $100 per year for formulation and product manufacture of commercial adhesives | 500 | 50% |
| Bishop Technologies, LTD | List of Equipment On Exhibit D | 500 | 50% |
| Total | _____ | 1000 | 100% |

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -30-

**SCHEDULE 1 OF**
**EXHIBIT A TO THE**
**OPERATING AGREEMENT**
**OF**
**ECO-PUR SOLUTIONS, LLC**

## DESCRIPTION OF CONTRIBUTED PROPERTY



OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -31-

**EXHIBIT B TO THE**
**OPERATING AGREEMENT**
**OF**
**ECO-PUR SOLUTIONS, LLC**

## ACCOUNTING PROCEDURES

The following accounting procedures shall apply to the operation of the Company:

1. Definitions

(a) "Adjusted Capital Account Deficit" means, with respect to each Unit Holder, the deficit balance, if any, in such Unit Holder's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (i) Credit to such Capital Account any amounts which such Unit Holder is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii) (d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1-704-1(b)(2) (ii)(d) of the Regulations and shall be interpreted consistently therewith.

(b) "Debt" means (i) any indebtedness for borrowed money or the deferred purchase price of property as evidenced by a note, bonds, or other instruments, (ii) obligations as lessee under capital leases, (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby, (iv) any obligation under any interest rate swap agreement, (v) accounts payable and (vi) obligations under direct or indirect guarantees of (including obligations (contingent or otherwise) to assure a creditor against loss in respect of) indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii), (iv) and (v), above provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

(c) "Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

(d) "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset as mutually determined by the contributing Member and the Manager, provided that the initial Gross Asset Values of the Initial Capital Contribution shall be as set forth in Exhibit A.

(ii) The Gross Asset Values of all Company Property shall be adjusted to equal their respective fair market values (taking into account Code Section 7701(g)) as determined by the Manager, as of the following times: (a) the acquisition of an additional interest by any new or existing Unit Holder in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Company to a Unit Holder of more than a *de minimis* amount of Company Property as consideration for Units; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Unit Holders in the Company;

(iii) The Gross Asset Value of any Company asset distributed to any Unit Holder shall be adjusted to equal the fair market value of such asset on the date of distribution as mutually determined by the Manager; and

(iv) The Gross Asset Values of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Company Property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2) (iv)(m) and subparagraph (vi) of the definition of Profit and Loss in subsection (e) below; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph to the extent that an adjustment pursuant to subparagraph (ii) above is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC

-32-

If the Gross Asset Value of Company Property has been determined or adjusted pursuant to this paragraph (d), such Gross Asset Value shall there-after be adjusted by the Depreciation taken into account with respect to such Company Property for purposes of computing Profits and Losses.

(e) "**Member Nonrecourse Debt**" shall have the same meaning as the term "Member Nonrecourse debt" used in Section 1.704-2(b)(4) of the Regulations.

(f) "**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

(g) "**Member Nonrecourse Deductions**" has the same meaning as the term "Member nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(h) "**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

(i) "**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

(j) "**Profits**" and "**Losses**" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any Company Property is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of Gross Asset Value above, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) r an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such Company Property and shall be taken into account for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from the disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company Property disposed of, notwithstanding that the adjusted tax basis of such Company Property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of Depreciation, above.

(vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Unit Holder's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the Company Property and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this sub-paragraph, any items which are specially allocated pursuant to Section 3, below, shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 3, below, shall be determined by applying rules analogous to those set forth in this subparagraph.

2.       Adjustments To Capital Accounts.

(a) Increases. To each Unit Holder's Capital Account there shall be credited that person's Capital Contributions, that person's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 3 below, and the amount of any Company liabilities assumed by such person or which are secured by any Company Property distributed to such person. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or a Unit Holder related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Unit Holder until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2);

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                    -33-

(b) **Decreases.** To each Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company Property distributed to the owner of such Capital Account pursuant to any provision of this Agreement, such Unit Holder's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 3, below, and the amount of any liabilities of such Unit Holder assumed by the Company or which are secured by any property contributed by such Unit Holder to the Company.

(c) **Effect of Liabilities.** In determining the amount of any liability for purposes of subparagraphs (a) and (b), above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

(d) **Compliance with Regulations.** The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Unit Holder), are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Unit Holder upon the dissolution of the Company. In addition, the Manager shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

3. **Special Allocations.**

The following special accounting allocations shall be made in the following order:

(a) **Loss Limitation.** Losses allocated pursuant to Article 4 of this Agreement shall not exceed the maximum amount of Losses that can be allocated without causing any Unit Holder to have a deficit in his Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event that some but not all of the Unit Holders would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Article 4 of this Agreement, the limitation set forth in this paragraph 3(a) shall be applied on a person by person basis and Losses not allocable to any Unit Holder as a result of such limitation shall be allocated to the other Unit Holders in accordance with the positive balances in such Unit Holder's Capital Accounts so as to allocate the maximum permissible Losses to each Unit Holder under Section 1.704-1(b)(2)(ii)(d) of the Regulations.

(b) **Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision in this Section, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Unit Holder shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Unit Holder's share of the net decrease of the Company Minimum Gain, determined in accordance with Regulations 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unit Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This subparagraph (b) is intended to comply with the minimum gain chargeback requirements in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c) **Unit Holder's Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in Unit Holder Nonrecourse Debt Minimum gain attributable to a Unit Holder Nonrecourse Debt during any Fiscal Year, each Unit Holder who has a share of the Unit Holder Nonrecourse Debt Minimum Gain attributable to such Unit Holder Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Unit Holder's share of the net decrease in Unit Holder Nonrecourse Debt, determined in accordance with Regulations 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unit Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This subparagraph (c) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d) **Qualified Income Offset.** In the event any Unit Holder unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Unit Holder in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Unit Holder as quickly as possible, provided that an allocation pursuant to this subparagraph (d) shall be made only if and to the extent that such Unit Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 3 have been tentatively made as if the Qualified Income Offset of this subparagraph was not in the Agreement.

(e) **Gross Income Allocation.** In the event any Unit Holder has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Unit Holder is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Unit Holder is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Unit Holder shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this subparagraph (e) shall be made only if and to the extent that such Unit Holder would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 3 have been made as if the Qualified Income Offset of subparagraph (d) above and the Gross Income Allocation of this subparagraph were not in the Agreement.

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                  -34-

(f) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Unit Holders in proportion to their Percentage Interests.

(g) Unit Holder Nonrecourse Deductions. Any Unit Holder Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Unit Holder who bears the economic risk of loss with respect to the Unit Holder Nonrecourse Debt to which such Unit Holder Nonrecourse Deductions are attributable in accordance with Section 1.704-2(I)(1).

(h) 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Unit Holder in complete liquidation of that Unit Holder's Company Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Unit Holders in accordance with their Company Interests in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies or to the Unit Holder to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(i) Curative Allocations. The allocations set forth in subparagraphs (a) through (h), above ("Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this paragraph. Therefore, notwithstanding any other provision of this Section 3 (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Unit Holder's Capital Account is, to the extent possible, equal to the Capital Account such Unit Holder would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Article 4 of this Agreement and paragraph (j), below concerning Issuance Items.

(j) Issuance Items. Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of Units by the Company to a Member (the "Issuance Items") shall be allocated among the Unit Holders so that , to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Unit Holder shall be equal to the net amount that would have been allocated to each such Unit Holder if the Issuance Items had not been realized.

4.  Tax  Allocations.

(a) 704(c) Method. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Company Property contributed to the Company shall, solely for tax purposes, be allocated among the Unit Holder's so as to take account of any variation between the adjusted basis of such Company Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using any reasonable method consistent with the purpose of Section 704(c) and Regulation 1.704-3.

(b) Revaluations. In the event the Gross Asset Value of any Company Property is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such Company Property shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c) Elections. Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4 of Exhibit B are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Unit Holder's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

5.  Deficit Capital Accounts and Distributions.

(a) In the event the Company is "liquidated" within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, then distributions shall be made to the Unit Holders who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2).

(b) If any Unit Holder has a deficit balance in his Capital Account (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), the Unit Holder shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

(c) In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Unit Holders pursuant to the winding up of the Company may be:

(i) Distributed to a trust established for the benefit of the Unit Holders for the purposes of liquidating Company Property, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Unit Holders from time to time, in the reasonable discretion of the Manager in the

OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                                -35-

same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Unit Holders; or

(ii) Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Unit Holders as soon as practicable.

6. <u>Deemed Distribution and Recontribution</u>.

Notwithstanding any other provisions of this Agreement, in the event the Company is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations but no Liquidating Event has occurred, the Company Property shall not be liquidated, the Company's Debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the Company Property in kind to the Unit Holders, who shall be deemed to have assumed and taken subject to all Debts of the Company and other liabilities, all in accordance with their respective Capital Accounts. Immediately thereafter, the Unit Holders shall be deemed to have recontributed the Company Property in kind to the Company, which shall be deemed to have taken subject to all such liabilities.



OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -36-

## <u>EXHIBIT C</u>



OPERATING AGREEMENT
OF ECO-PUR SOLUTIONS, LLC                    -37-

### EXHIBIT D

Itemized list of Bishop Technologies assets assigned to ECO-PUR Solutions, LLC

| | Description | Value |
|---|---|---|
| 1. | 100 Gallon Pfaudler Reactor | $10000.00 |
| 2. | 250 Gallon Hastelloy Reactor | $15000.00 |
| 3. | 36 kW Mokon Oil Heater | $10000.00 |
| 4. | 24 kW Mokon Oil Heater | $10000.00 |
| 5. | Barr Inc Freezer | $10000.00 |
| 6. | Benko 8-drum oven | $12000.00 |
| 7. | Benko 4-drum oven | $8000.00 |
| | **TOTAL** | **$75000.00** |